UNITED STATES DISTRICT COURT

For the Northern District of California

1

2

3

4

5

6                    UNITED STATES DISTRICT COURT

7                    NORTHERN DISTRICT OF CALIFORNIA

8

9

10  COLLABORATION PROPERTIES, INC., a Nevada          No. C 05-01940 MHP
    Corporation,

11                    Plaintiff,

12      v.                                            **MEMORANDUM & ORDER**
                                                      **Re: Claim Construction**
13  TANDBERG ASA, and TANDBERG, INC., a
    Delaware Corporation,

14                    Defendants.

15

16  _____/

17          Plaintiff Collaboration Properties, Inc. ("CPI") filed this action against defendants Tandberg

18  ASA and Tandberg, Inc. (collectively, "Tandberg"), alleging infringement of U.S. Patent Nos.

19  5,867,654 (the "'654 patent"), 5,896,500 (the "'500 patent") and 6,212,547 (the "'547 patent").  The

20  asserted patents relate generally to videoconferencing hardware and software.  Now before the court

21  are the parties' proposed claim constructions.  Having considered the parties' arguments and

22  submissions, and for the reasons set forth below, the court enters the following memorandum and

23  order.

24

25  BACKGROUND[1]

26          Tandberg distributes and sells teleconferencing products, including videoconferencing

27  hardware and software.  CPI is a patent holding company; CPI is also the wholly owned subsidiary

28

of Avistar Communications Corp., which competes with Tandberg.  CPI owns the three patents at issue in this lawsuit.

The three asserted patents derive from the same original application, Ser. No. 131,523, filed October 1, 1993.  The specifications for all three patents are identical in all relevant respects, unless otherwise noted.  For convenience, the court will use column and line numbers from the specification of the '654 patent, hereinafter referred to as the "Specification" or "Spec.," for citations in this order.

The asserted patents cover, generally, a multimedia communication and collaboration system.  The disclosed invention combines voice and video conferencing with the ability to exchange data and other media types between geographically dispersed locations.  Users of the system interact with each other via "collaborative multimedia workstations," or CMWs, which facilitate the exchange of audio, video and data.

The Specification distinguishes the claimed invention from prior art videoconferencing and collaboration systems in a number of respects.  First, the Specification describes the invention as a "desktop" teleconferencing system which can be located at individual work areas and does not require the use of special-purpose videoconferencing centers.  Spec. at 2:11–15, 1:13–18 ("Principal among the invention's goals is to replicate in a desktop environment, to the maximum extent possible, the full range, level and intensity of interpersonal communication and information sharing which would occur if all the participants were together in the same room at the same time.").

Second, the Specification distinguishes prior art videoconferencing systems which seek to achieve data sharing capability by "augment[ing] . . . videoconferencing systems with limited 'video mail' facilities."  Id. at 2:18–19.  Rather than "add computing capabilities to a videoconferencing system," the Specification explains that the invention "adds multimedia and collaboration capabilities to the user's existing computer system."  Id. at 2:27–30.

Finally, the Specification distinguishes prior art desktop videoconferencing systems which offer only low-quality video as a result of inadequate network bandwidth.  Id. at 2:34–54.  The

2

UNITED STATES DISTRICT COURT
For the Northern District of California

1  preferred embodiment of the invention addresses the bandwidth requirements through use of a

2  separate, dedicated real-time audio and video network.  Id. at 3:27–31.

3      The parties have identified eleven terms for construction, taken from the three patents.

4

5  LEGAL STANDARD

6      Under Markman v. Westview Instruments, Inc., 517 U.S. 370, 389–90 (1996), the court

7  construes the scope and meaning of disputed patent claims as a matter of law.  The first step of this

8  analysis requires the court to consider the words of the claims.  Teleflex, Inc. v. Ficosca N. Am., 299

9  F.3d 1313, 1324 (Fed. Cir. 2002).  According to the Federal Circuit, the court must "indulge a

10 'heavy presumption' that a claim term carries its ordinary and customary meaning." CCS Fitness,

11 Inc. v. Brunswick Corp., 288 F.3d 1359, 1366 (Fed. Cir. 2002).  To determine the ordinary meaning

12 of a disputed term, the court may review a variety of sources, including the claims themselves, other

13 intrinsic evidence including the written description and prosecution history, and dictionaries and

14 treatises.  Teleflex, 299 F.3d at 1325.   The court must conduct this inquiry not from the perspective

15 of a lay observer, but rather "from the standpoint of a person of ordinary skill in the relevant art."

16 Id. (citing Zelinski v. Brunswick Corp., 185 F.3d 1311, 1316 (Fed. Cir. 1999)).

17     Among the sources of intrinsic evidence, the specification is "the single best guide to the

18 meaning of a disputed term."   Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir.

19 1996).  By expressly defining terms in the specification, an inventor may "choose[] to be his or her

20 own lexicographer," thereby limiting the meaning of the disputed term to the definition provided in

21 the specification.  Johnson Worldwide Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 990 (Fed. Cir.

22 1999).  In addition,"[e]ven when guidance is not provided in explicit definitional format, "the

23 specification may define claim terms 'by implication' such that the meaning may be 'found in or

24 ascertained by a reading of the patent documents.'" Irdeto Access, Inc. v. Echostar Satellite Corp.,

25 383 F.3d 1295, 1300 (Fed. Cir. 2004) (quoting Bell Atl. Network Servs., Inc v. Covad Commc'ns

26 Group, Inc., 262 F.3d 1258, 1268 (Fed. Cir. 2001)).  "The specification may also assist in resolving

27 ambiguity where the ordinary and accustomed meaning of the words used in the claims lack

28

3

sufficient clarity to permit the scope of the claim to be ascertained from the words alone." Teleflex, 299 F.3d at 1325.  At the same time, the Federal Circuit has cautioned that the written description "should never trump the clear meaning of the claim terms."  Comark Commc's, Inc. v. Harris Corp., 156 F.3d 1182, 1187 (Fed. Cir. 1998) (citations omitted); see also Tate Access Floors, Inc. v. Maxess Techs., Inc., 222 F.3d 958, 966 (Fed. Cir. 2000) ("Although claims must be read in light of the specification of which they are part, . . . it is improper to read limitations from the written description into a claim . . . .").

Likewise, the prosecution history may demonstrate that the patentee intended to deviate from a term's ordinary and accustomed meaning.  Teleflex, 299 F.3d at 1326.  "Arguments and amendments made during the prosecution of a patent application and other aspects of the prosecution history, as well as the specification and other claims, must be examined to determine the meaning of terms in the claims."  Southwall Techs., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir.), cert. denied, 516 U.S. 987 (1995).  "In particular, 'the prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance.'"  Teleflex, 299 F.3d at 1326 (quoting Standard Oil Co. v. American Cyanamid Co., 774 F.2d 448, 452 (Fed. Cir. 1985)).

Dictionary definitions and other objective reference materials available at the time that the patent was issued may also provide evidence of the ordinary meaning of a claim.  Phillips v. AWH Corp., 415 F.3d 1303, 1322 (Fed. Cir. 2005) (en banc); Texas Digital Sys., Inc. v. Telegenix, Inc., 308 F.3d 1193, 1202 (Fed. Cir. 2002).  A dictionary "has the value of being an unbiased source, accessible to the public in advance of litigation."  Phillips, 415 F.3d at 1322 (internal quotation omitted).  Thus, district courts "are free to consult such resources at any time in order to better understand the underlying technology and may also rely on dictionary definitions when construing claim terms, so long as the dictionary definition does not contradict any definition found in or ascertained by a reading of the patent documents."  Vitronics, 90 F.3d at 1584 n.6.  A court should be cautious, however, not to place too much reliance on dictionaries, as the resulting construction

UNITED STATES DISTRICT COURT
For the Northern District of California

4

UNITED STATES DISTRICT COURT
For the Northern District of California

1  may be too broad.  Phillips, 415 F.3d at 1321.

2       Federal Circuit decisions take a less favorable view of other forms of extrinsic evidence,

3  such as expert testimony and prior art not cited in the specification or the prosecution history, noting

4  that "claims should preferably be interpreted without recourse to extrinsic evidence, other than

5  perhaps dictionaries or reference books, and that expert testimony should be received only for the

6  purpose of educating the judge."  EMI Group N. Am., Inc. v. Intel Corp., 157 F.3d 887, 892 (Fed.

7  Cir. 1998), cert. denied, 526 U.S. 1112 (1999).  Although "extrinsic evidence in general, and expert

8  testimony in particular, may be used . . . to help the court come to a proper understanding of the

9  claims[,] it may not be used to vary or contradict the claim language . . . .   Indeed, where the patent

10  documents are unambiguous, expert testimony regarding the meaning of a claim is entitled to no

11  weight."  Vitronics, 90 F.3d at 1584.

12       The Federal Circuit recently revisited the basic approach to claim construction in Phillips,

13  which provides at least two pieces of additional guidance.  First, the Federal Circuit rejected a line of

14  cases suggesting that claim interpretation must begin with a dictionary definition of the disputed

15  terms.  Phillips, 415 F.3d at 1320–21.  Second, the Federal Circuit emphasized that claim terms must

16  be interpreted in light of their context, especially the language used in other claims and the

17  specification.  See id. at 1321.  Taken as a whole, Phillips appears to signal a small retreat from

18  formalism and bright-line rules in claim construction.  As a result, the court will focus primarily on

19  the intrinsic record before it.  Cases cited by the parties in support of fixed "rules" of claim

20  construction will accordingly be given somewhat less weight.

21  //

22  //

23  //

24  //

25  //

26  //

27  //

28

//

DISCUSSION

The following chart summarizes the court's construction of the disputed terms.  The full analysis supporting each construction is below.

| Term | Construction |
|------|-------------|
| "workstation" | "a position including a device or group of devices, which are equipped with capabilities for computer data processing in combination with audio and video interaction, and which are based upon or include a conventional desktop or portable computer." |
| "path" | "a route or course" |
| "AV path" | "a route or course over which audio and/or video (commonly abbreviated 'AV') information travels for real-time delivery" |
| "data path" | "a route or course over which information represented in a form suitable for processing by computer can travel, but such information does not include AV signals" |
| "second path" | "the AV path" |
| "conferencing control" | "hardware and / or software at each workstation which is used to initiate and facilitate videoconferencing, data conferencing, and other collaborative sessions" |
| "central control manager" | "hardware and / or software that is separate from the conferencing control and that is capable of establishing and managing video and data connections for multiple workstations" |
| "group of collaboration types" | "a group of types of collaboration, such as telephone, videophone, email, snapshot sharing, application sharing, computer-integrated telephony, and computer-integrated fax" |
| "TV quality" | "generally of the same quality as television (at the time the patent was filed)" |

7

| | |
|---|---|
| "a call state, being at least one of the group consisting of active and hold states" | "a call state, which is 'active,' 'hold,' or both 'active' and 'hold' simultaneously" |
| "a plurality of communication ports, each supporting at least one of the group of switch connections consisting of video in, video out, audio in and audio out" | "at least two communication ports in the video conferencing system (at least one for each AV device), each port supporting one or more of audio in, audio out, video in and video out connections to an analog or digital AV switch, which may be physical or logical" |

I.    "workstation"

The term "workstation" appears in the claims of the '654 and '547 patents. Claim 11 from the '547 patent is representative:

> 11. A teleconferencing system, for conducting a teleconference among a plurality of users, comprising:
>
>    (a) a plurality of **workstations**
>        (i) each associated with at least one user,
>        (ii) each **workstation** including
>            (1) a video display device, and
>            (2) associated audio reproduction capabilities;
>
>    (b) audio and video (AV) capture capabilities configured to capture
>        (i) video images and
>        (ii) spoken audio
>        (iii) of a **workstation** user; and
>
>    (c) at least one unshielded twisted pair of wires defining
>        (i) a UTP data path
>            (1) along which data can be shared
>            (2) among the **workstations**, and
>        (ii) a UTP AV path,
>            (1) along which AV signals
>                a. representing user video images and audio
>                b. can be transported among the **workstations**,
>
>    wherein the system is configured to
>        (i) interactively display images
>            (1) based on the shared data,
>            (2) on at least two of the video display devices, and

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1

(ii) reproduce video images and spoken audio
(1) based on the AV signals,
(2) on at least one of the video display devices.

2

3 '547 patent at 42:52–43:11.

4        CPI argues that "workstation" should be construed to mean "a position for an operator or

5 user that is equipped with capabilities for computer data processing in combination with audio and

6 video interaction." Tandberg argues that "workstation" should be construed to mean "a general

7 purpose computer." At oral argument, CPI acknowledged that the "position" in its proposed

8 construction must contain one or more devices. The parties' constructions thus differ in only one

9 respect: whether the device or group of devices must include a general purpose computer.

10       The claims themselves place certain requirements on the workstation. Claims 1 and 8 of the

11 '654 patent require that the workstation have "first and second monitors." Id. at 41:38–40; see id. at

12 42:34–41. Claims 1 and 8 also require that the workstation have "AV capture capabilities." Finally,

13 both claims require that the workstation be "configured to control . . . the reproduction of images,

14 based on the data signals, on the first monitor" and "the reproduction of participant video images,

15 based on the AV signals, on the second monitor." Id. at 41:49–55, 42:42–50. Similarly, claim 11 of

16 the '547 patent requires a workstation which includes "a video display device" and "audio

17 reproduction capabilities." '547 patent at 42:54–58. In addition, the workstation must be able to

18 share data with other workstations, and must be "configured to . . . interactively display images . . .

19 based on the shared data" and to "reproduce video images and spoken audio . . . based on the AV

20 signals . . . on at least one of the video display devices." Id. at 42:64–43:11. Taken together, the

21 claims suggest that a workstation must at a minimum have the abilities to process AV signals, to

22 process data, and to control the processing and reproduction of the AV signals and data.

23       Other than the specific physical components listed above, the claims do not expressly limit

24 the type of system that can be used to implement the required capabilities. Tandberg's argument

25 that the workstation must consist of a "general purpose computer" is therefore based on uses of the

26 word "workstation" and descriptions of the CMW in the specification.

27

28

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1    Tandberg argues that the specification expressly defines "workstation" to be a general

2   purpose computer.  Column 2, lines 34–37 states that "audio and video capture and processing

3   capabilities have recently been integrated into desktop and portable personal computers and

4   workstations (hereinafter generically referred to as 'workstations')."  Although the cited passage

5   purports to establish a uniform meaning of "workstation," the Specification and claims continue to

6   use the word "workstation" in two different senses.

7    In the first sense, "workstation" refers to a particular type of high-performance computer,

8   most commonly running some variant of UNIX.  <u>See</u> Spec. at 14:63–15:1 ("Currently available

9   personal computers (e.g., an Apple Macintosh or an IBM-compatible PC, desktop or laptop) and

10   workstations (e.g., a Sun SPARCstation) can be adapted to work with the present invention."); <u>id.</u> at

11   15:33–41 (describing certain AV-enabled computers, including "Silicon Graphics' Indy

12   workstations.").  For purposes of clarity, the court will use the phrase "UNIX workstation" to

13   indicate the narrower sense.

14    In the second, broader sense, "workstation" refers to the CMW, which includes AV

15   capabilities above and beyond what were found in contemporaneous computers and UNIX

16   workstations.  Although the Specification is somewhat clumsy in its use of a single word to describe

17   two different concepts, certain passages make clear that the CMW "workstation" is broader in its

18   functionality than the UNIX workstation on which it may be based.  For example, the sentence

19   "[t]he currently available personal computers and workstations serve as a base workstation platform"

20   uses both senses of the word workstation; a UNIX workstation may serve as the platform on which

21   the multimedia-enabled CMW is based.  <u>Id.</u> at 15:11–12.  "The addition of certain audio and video

22   I/O devices to the standard components of the base platform . . . enables the CMW to generate and

23   receive real-time audio and video signals."  <u>Id.</u> at 15:12–19.  Tandberg's argument that the word

24   "workstation" as used in the claims is strictly synonymous with "desktop and portable personal

25   computers and workstations" as used in the Specification is therefore incorrect.

26

27

28

10

1    The proper question is whether the "base workstation platform" upon which the CMW is

2    based can be anything other than a desktop computer or workstation.  Under CPI's construction, any

3    device with "capabilities for computer data processing" could serve as the base platform.

4    The statements distinguishing the invention from the prior art in the Summary of the

5    Invention preclude CPI's broad construction.  As Tandberg notes, "[s]tatements that describe the

6    invention as a whole, rather than statements that describe only preferred embodiments, are more

7    likely to support a limiting definition of a claim term."  C.R. Bard v. United States Surgical Corp.,

8    388 F.3d 858, 864 (Fed. Cir. 2004).  In C.R. Bard, the Federal Circuit relied on language in the

9    Abstract and Summary of the Invention in concluding that the claimed prosthesis was required to

10   have "a pleated surface."  Id. at 863–64.  The Abstract stated that the "implantable prosthesis

11   includ[es] a pleated surface."  Id. at 864.  The Summary of Invention also stated that "[t]he implant

12   includes a pleated surface."  Id.  Because the patentee consistently stated that the invention had a

13   pleated surface, the Federal Circuit found that the claim term was limited.  Id.

14   Although the court does not embrace a categorical rule that statements made in the Abstract,

15   Summary of the Invention and Background of the Invention necessarily limit claim scope, the

16   statements at issue here are particularly significant because they distinguish the patented invention

17   from the prior art:

18   It has been proposed to extend traditional videoconferencing capabilities from
     conference centers, where groups of participants must assemble in the same room, to
19   the desktop, where individual participants may remain in their office or home. Such a
     system is disclosed in U.S. Pat. No. 4,710,917 to Tompkins et al. for Video
20   Conferencing Network issued on Dec. 1, 1987. It has also been proposed to augment
     such video conferencing systems with limited "video mail" facilities. However, such
21   dedicated videoconferencing systems (and extensions thereof) do not effectively
     leverage the investment in existing embedded information infrastructures--**such as**
22   **desktop personal computers and workstations, local area network (LAN) and**
     **wide area network (WAN) environments, building wiring, etc.**--to facilitate
23   interactive sharing of data in the form of text, images, charts, graphs, recorded video,
     screen displays and the like. **That is, they attempt to add computing capabilities to**
24   **a videoconferencing system, rather than adding multimedia and collaborative**
     **capabilities to the user's existing computer system.** Thus, while such systems may
25   be useful in limited contexts, they do not provide the capabilities required for
     maximally effective collaboration, and are not cost-effective.

26

27

28

11

UNITED STATES DISTRICT COURT
For the Northern District of California

1  Spec. at 2:12–33 (emphasis added).  This language unambiguously disclaims systems which do not

2  "add[] multimedia and collaborative capabilities to the user's existing computer system."  See also

3  id. at 3:53–57 ("The present invention thus provides a distributed multimedia collaboration

4  environment that . . . leverages ('snaps on to') existing computing and network infrastructure to the

5  maximum extent possible.").

6       The invention disclosed in U.S. Pat. No. 4,710,917 (the "'917 patent"), which is cited and

7  distinguished in the passage quoted above, illustrates the way in which CPI's construction is

8  overbroad.  The '917 patent covers "a video conferencing network for providing video, audio and

9  data communication between remotely disposed video terminals."  '917 patent at 2:54–56.  Each

10  video terminal ("MATE") contains a Central Processing Unit ("CPU") for data processing as well as

11  equipment for recording and displaying audio and video data.  Id. at 6:62–65, 5:26–34.  The MATE

12  described in the '917 patent is thus "a position for an operator or user that is equipped with

13  capabilities for computer data processing in combination with audio and video interaction," which

14  falls squarely within CPI's broad proposed construction.

15       At oral argument, CPI noted that the invention of the '917 patent differs from the claimed

16  invention in other respects, including the lack of data conferencing capabilities.  The Specification,

17  however, distinguishes the invention of the '917 patent on the grounds that it is a "dedicated video

18  conferencing system" that "does not effectively leverage the investment in existing embedded

19  information infrastructures," and on the grounds that it "attempt[s] to add computing capabilities to a

20  videoconferencing system."  Spec. at 2:19–33.  This language serves as an express disclaimer of

21  dedicated videoconferencing systems with added data processing capabilities.

22       A passage from the lengthy "remote expert" scenario at the end of the Specification also

23  strongly supports this construction, as it refers to the "invention" rather than any preferred

24  embodiment:

25         It should be noted that the above scenario involves many state-of-the-art desktop
       tools (e.g., video and information feeds, information filtering and voice recognition)

26         that can be leveraged by our Expert during videoconferencing, data conferencing and
       other collaborative activities provided by the present invention--because *this*

27         *invention, instead of providing a dedicated videoconferencing system, provides a*

28

*desktop multimedia collaboration system that integrates into the Expert's existing workstation/LAN/WAN environment.*

Id. at 41:18–26 (emphasis added).

The Specification's discussion of the outer limits of what might be viewed as a workstation further supports a narrower construction than CPI proposes. As already discussed, the CMW consists of a base workstation platform, augmented with audio and video capabilities. The capabilities can be added in a variety of ways. At one extreme, the capabilities can be completely incorporated into the base platform: "Add-on box itself can be implemented as an add-in card to the base platform 100. Connections to the audio and video I/O devices . . . can be implemented internally (e.g. via the system bus) rather than through an external RS-232 or SCSI peripheral port." Spec. at 16:17–22. At the other extreme, "Side Mount unit 850 can become virtually a standalone device that does not require a separate computer for services using only audio and video. This also provides a way of supplementing a network of full-feature workstations with a few low-cost additional 'audio video intercoms' . . ." Id. at 18:9–14. This second passage is notable because it defines the outer limits of a workstation; a device which "does not require a separate computer" is referred to as an "intercom" rather than a "full-feature workstation." Consequently, the court finds that "workstation" means "a position including a device or group of devices, which are equipped with capabilities for computer data processing in combination with audio and video interaction, and which are based upon or include a conventional desktop or portable computer."

II.    "AV path" / "data path" / "second path" / "path"

The parties request construction of three different types of "paths," as well as resolution of a global issue pertaining to all "paths" in the asserted claims. The three disputed uses of the term "path" appear in Claim 1 of the '654 patent:

>    1. A teleconferencing system for conducting a teleconference among a plurality of participants, comprising:
>
>        (a) a plurality of workstations, each workstation having first and second monitors and in communication with audio and video (AV) capture capabilities;

13

(b) a **data path** in communication with the plurality of workstations, over which data can be shared among the plurality of participants; and

(c) an **AV path** in communication with the plurality of workstations, along which AV signals, representing video images and spoken audio of the participants, can be carried;

wherein, the system is configured to reproduce images, based on data signals shared along the **data path**, on at least two first monitors so as to permit participants associated with the workstations having the two first monitors to interactively share the reproduced images and reproduce participant video images, based on AV signals carried along the **second path**, on at least two second monitors.

'654 patent at 41:36–55.

A.    "path"

Tandberg argues that each type of claimed path must be "defined" or specified before data or AV signals are transmitted.  Tandberg argues that the claim language compels this finding.  For example, claim 15 states that the data conferencing control establishes "communications with the central control manager *to set up requested data paths* along a second network over which the data conference can be conducted."  '654 patent at 44:3–9.  According to Tandberg, once the central control manager has "set up" the path (which occurs before transmission takes place), the path has been defined.

This argument depends on the meaning of "set up."  For Tandberg's argument to be valid, "set up" must mean "define."  The phrase "set up," however, encompasses other meanings, such as "establish" or "make ready."  See, e.g., Webster's Third New International Dictionary of the English Language Unabridged 2079 (1993) ("to put (a machine) in readiness or adjustment"); Random House Unabridged Dictionary 1751 (2d ed. 1993) ("to be assembled *or made ready for use*") (emphasis added).  Moreover, as discussed below, Tandberg's narrow construction would exclude all of the embodiments disclosed in the specification, which unquestionably make use of opportunistic routing and do not require predefined paths.

Tandberg next points to Figure 4 of the patent, which depicts different routes that an AV signal may take through the Wide Area Network ("WAN").  The portion of the Specification

14

1   corresponding to Figure 4 states that "[t]he system also provides optimal routes for audio/video

2   signals through the WAN.  For example, in Figure 4, location A can take either a direct route to

3   location D via path 47, or a two hop route through location C via paths 48 and 49."  Spec. at

4   10:55–59.  The fact that data can take one of two routes, however, says nothing about whether the

5   choice of route is predetermined.  Indeed, Tandberg observed at argument that in packet-switched

6   networks such as those described in the Specification, the route through the WAN could change

7   during the middle of a transmission, depending on network load and other factors.  The routing of

8   each packet through a packet-switched network is individually determined and can change to adapt

9   to changing network conditions.  See Spec. at 10:63–66 ("In a more complex network, several multi-

10   hop routes are typically available, in which case the routing system handles the decision making,

11   which for example can be based on network loading considerations.").

12          Tandberg's remaining arguments in support of its contention that all paths must be

13   predefined relate to a different question—whether the AV and data paths must lie on physically

14   separate wires.  The court considers these arguments below.  The fact that signals may travel on

15   different wires, however, is not determinative of whether the path for each signal individually is pre-

16   defined.  The court will therefore not limit the claim terms as Tandberg requests, and construes

17   "path" to mean "a route or course."

18

19          B.      "AV path"

20          CPI argues that the "AV path" should be construed to mean "a route or course over which

21   audio and/or video (commonly abbreviated 'AV') information travels for real-time delivery."

22   Tandberg does not expressly offer a construction of "AV path," but suggests in its papers that the

23   AV path must be physically separate from the data path.

24          In an earlier litigation involving the '654 and '547 patents, Judge Chesney of this district has

25   already construed the terms "AV path" and "data path" and rejected the very argument which

26   Tandberg advances in this case.  Collaboration Props., Inc. v. Polycom, Inc., No. C 02-04591, slip

27   op. at 27 (N.D. Cal. Mar. 23, 2004).  The Polycom court reviewed the intrinsic record and concluded

28

UNITED STATES DISTRICT COURT
For the Northern District of California

UNITED STATES DISTRICT COURT
For the Northern District of California

1   that the claimed inventions cover both the preferred embodiment, in which AV and data signals

2   travel over two separate physical paths, and alternate embodiments in which the AV and data signals

3   travel on the same wire through the use of multiplexing. Id. at 26. With respect to arguments

4   already presented to the Polycom court, this court has not been given a compelling reason to revisit

5   them. See, e.g., id. at 25 (noting that "claim 29 of the '547 patent requires the data path and AV

6   path to be on a single set of wires."). This court further notes that the AV and data paths may pass

7   through a common "switch"; a physically separate AV switch is not required. The Specification

8   makes clear that in an all-digital implementation, "a common switching vehicle (e.g. ATM) could be

9   used." Spec. at 7:16–18. The court therefore adopts the Polycom court's finding, as augmented

10  above, that the AV and data signals may travel on logically separate "paths," via multiplexing, while

11  traveling over the same physical wires and while being routed through the same switching

12  mechanism.

13          Tandberg offers several additional arguments not discussed by the Polycom court. First,

14  Tandberg argues that CPI conceded during prosecution that AV and data signals are transmitted

15  along two different network paths. The examiner rejected certain claims for indefiniteness because

16  "applicant should clarify the nature of the associations as claimed in respective claims where the

17  word 'associated' is used  This is especially true where there are two different network paths and

18  two monitors in the system." Day Dec., Exh. F ¶ 20. According to Tandberg, CPI did not dispute

19  the examiner's characterization, and cannot now allege that AV and data signals may travel along

20  the same path. This argument is unavailing because, among other reasons, the examiner's

21  observation that there are two "paths" says nothing about whether the two paths must travel on two

22  separate physical wires. As the Polycom court noted, claim 29 of the '547 patent expressly covers

23  two logical "paths" on the same physical wire: "A method for conducting a teleconference . . . over

24  at least one unshielded twisted pair of wires defining *both a UTP data path and a UTP AV path*."

25  '547 patent at 45:1–4 (emphasis added).

26          Second, Tandberg argues that CPI conceded that physical separation is required in response

27  to another rejection by the PTO, in which the examiner challenged claims in which data and video

28

16

1    were displayed on two separate monitors.  In response to the rejection, CPI identified Figure 18B of

2    the patent, which shows separate physical connections from the AV and data networks.  As CPI

3    points out, however, the examiner was concerned with the narrow question of how the display could

4    be split between two monitors, and not the broader question of whether AV and data signals could

5    travel along the same physical wire at some point.  See Supplemental Frahn Dec., Exh. 1(a) at 4–5.

6           Third, Tandberg argues that CPI limited the scope of the invention in the '654 patent in

7    response to a restriction requirement which compelled CPI to choose between inventions with two

8    physical paths and inventions with one physical path.  The restriction which the examiner imposed

9    divides the claims into two groups:  a group "drawn to a teleconferencing system having two

10   networks and two monitors" and a group "drawn to a teleconferencing apparatus having a unitary

11   housing."  Id. at 2.  The '654 patent issued from the first group.

12          Tandberg's reliance on this portion of the prosecution history is misplaced.  As an initial

13   matter, it is not clear from this restriction what the salient difference between the two groups is.  The

14   description of the second group suggests that the important distinction is the number of

15   monitors—requiring a "unitary housing" as opposed to "two monitors."  The second group is not

16   limited to a single network.  Also, as CPI points out, the applicants submitted amended claims in

17   response to the examiner's rejection in which they eliminated the requirement of a first and second

18   network.  Id., Exh. 1(b) at 2.  The final claims on the '654 patent issued in substantially the same

19   form.  Finally, to the extent the restriction requires two separate "networks," it does not require that

20   the networks make use of separate physical wires.

21          Fourth, Tandberg argues that the multiplexing embodiment, in which data and AV signals

22   travel over the same wire, is not enabled, and therefore should not be included within the claims.  As

23   CPI points out, however, it is now clearly established law that claims should not be construed to

24   preserve validity unless they are truly ambiguous in all other respects.  See Phillips, 415 F.3d at

25   1327 ("we have limited the maxim [that claims should be construed to preserve their validity] to

26   cases in which 'the court concludes, after applying all the available tools of claim construction, that

27   the claim is still ambiguous.'").  Here, in particular, claim 29 of the '547 clearly requires that both

28

paths travel along the same physical wire.  LizardTech, Inc. v. Earth Resource Mapping, Inc., 424 F.3d 1336 (Fed. Cir. 2005), reh'g en banc denied, 433 F.3d 1373 (Fed. Cir. 2006), cited by Tandberg, is not to the contrary.  The LizardTech court invalidated a patent for lack of enablement rather than revise the claim construction to exclude the non-enabled subject matter.  Id. at 1346–47 ("Therefore, we affirm the district court's judgment that claims 21–25 and 27–28 are invalid for failure to satisfy the requirements of section 112.").  Tandberg has the burden of proving lack of enablement at a later date, by clear and convincing evidence.

Finally, Tandberg argues that the Polycom claim construction is inconsistent in that it provides both for paths that are physically separate and paths that are not.  The Polycom court only noted, however, that certain claims expressly require varying degrees of physical separation while others do not.  Nothing about this holding is inconsistent.

The court therefore adopts the Polycom construction; "AV path" means "a route or course over which audio and/or video (commonly abbreviated 'AV') information travels for real-time delivery."

### C.    "data path"

Tandberg offers the same arguments with respect to "data path."  Having rejected them, the court adopts the Polycom construction:  "a route or course over which information represented in a form suitable for processing by computer can travel, but such information does not include AV signals."

### D.    "second path"

CPI proposes that "second path" should be defined as "contextual in meaning.  For example, as used in Claim 1 of the '654 patent, 'second path' refers to an AV path."  Tandberg does not offer a different opposing construction, other that as already explored supra.  While the meaning of the phrase "second path" may indeed be contextual, depending on its antecedent basis, for purposes of Claim 1 of the '654 patent "second path" refers to "the AV path."

**UNITED STATES DISTRICT COURT**
For the Northern District of California

III.     "conferencing control" / "central control manager"

The phrases "conferencing control" and "central control manager" appear in claim 15 of the '654 patent:

> 15. A method of conducting a teleconference among a plurality of participants, comprising the steps of:
>
> (a) initiating a video conference, from one of a plurality of workstations, using a video **conferencing control** included within each of the plurality of workstations, the video **conferencing control** establishing communication with a **central control manager** to set up AV paths along a first network over which the video conference can be conducted;
>
> (b) capturing video images and spoken audio of the participants for transmission in the form of AV signals over the AV paths during the video conference;
>
> (c) reproducing the video images and spoken audio on at least one first monitor, positioned near each workstation, from the AV signals received over the AV paths during the video conference;
>
> (d) initiating a data conference, during the video conference, using a data **conferencing control** included within each of the plurality of workstations, the data **conferencing control** establishing communication with the **central control manager** to set up requested data paths along a second network over which the data conference can be conducted; and
>
> (e) sharing data, among the plurality of participants, during the data conference, such that data received over the data paths is displayed on at least one second monitor included within each workstation.

'654 patent at 43:20–44:23.  As the two terms are related to each other, the court will construe them together.

A.     "conferencing control"

CPI proposes that the phrase "conferencing control" should be construed to mean "video or data conferencing software and/or hardware at a workstation."  Tandberg proposes that the phrase should be construed to mean "software executed by the workstation that initiates all collaborative sessions by setting up appropriate services and paths via the central control manager."  The parties' constructions differ in two respects.  First, Tandberg's construction requires that the conferencing

19

1    control set up all services and paths via the central control manager.  Second, CPI's construction

2    allows the conferencing control to be made up of hardware and/or software, while Tandberg's

3    construction requires that the control be made up exclusively of software.

4         The phrase "conferencing control" does not appear anywhere in the specification of the

5    patent.  The parties agree, however, that the element in the preferred embodiment corresponding to

6    the conferencing control is the Collaboration Initiator.  See Spec. at 18:51–52 ("The central

7    component of the Collaborative Multimedia Workstation software is the Collaboration Initiator

8    161.").

9         Tandberg argues that CPI's proposed construction is too vague because it says nothing about

10   what the conferencing control does.  Without some further restriction, "video conferencing software

11   and/or hardware" might encompass any part of the workstation that is involved in a

12   videoconference:  the keyboard, the monitor, the camera, the CPU, and the operating system, as well

13   as any special-purpose software or hardware associated exclusively with videoconferencing.  CPI's

14   construction is indeed too broad because it fails to account for the claim language.  The phrase

15   "conferencing control" has two elements.  First, the term relates to "conferencing"—both

16   videoconferencing and data conferencing.  Second, the term encompasses the notion of "control."

17   The surrounding claim language indicates that the control, at a minimum, must include setting up

18   video and data conferences.  See id. at 43:25–28 ("the videoconferencing control establishing

19   communication with a central control manager *to set up AV paths* along a first network over which

20   the video conference can be conducted") (emphasis added); id. at 44:5–9 ("the data conferencing

21   control establishing communication with the central control manager *to set up requested data paths*

22   along a second network over which the data conference can be conducted") (emphasis added).

23   Moreover, "control" has broader meaning than "initiation"; the conferencing control is used to

24   facilitate as well as initiate calls.  See Spec. at 18:35–41 ("[conference control] Software 160 allows

25   the user to initiate and manage (in conjunction with the server software) videoconferencing, data

26   conferencing, multimedia mail and other collaborative sessions.").  The court therefore finds that the

27

28

conferencing control must be able to "control"—i.e., initiate and facilitate—video and data conferences.

Tandberg is also correct in arguing that the "conferencing control" must "set[] up appropriate services and paths via the central control manager." The claim language already expressly includes this limitation, however, and adding it to the definition of "conferencing control" would be redundant. See '654 patent at 43:25–28, 44:5–9.

Turning to whether the control may consist of hardware or software, the specification clearly indicates that videoconferencing functionality may be implemented in hardware as well as software. See Spec. at 18:5–8 ("Given the proximity of Side Mount device 850 to the user, and the direct access to audio/video I/O within that device, various additional controls 820 can be provided at the user's touch (all well within the capabilities of those skilled in the art)." The "Side Mount" device is, in the preferred embodiment, a piece of additional hardware which is connected to a desktop computer or workstation. Id. at Fig 18B. Limiting the phrase "conferencing control" to software would exclude this disclosed embodiment, which is disfavored unless the claims present a compelling reason to do so.

Finally, the court notes that the hardware and software comprising the conferencing control must be present at each workstation. '654 patent at 43:23–24.

The court therefore construes the phrase "conferencing control" to mean "hardware and / or software at each workstation which is used to initiate and facilitate videoconferencing, data conferencing, and other collaborative sessions."

B.      "central control manager"

CPI argues that the phrase "central control manager" should be construed to mean "software and/or hardware that establishes and manages connections for a video conference." Tandberg argues that the phrase should be construed to mean "A special purpose computer which manages the audio and video switching circuitry, the state of the call, and selectively establishes connections between physical ports on different workstations." The parties' constructions differ in three respects. First, Tandberg's construction requires that the central control manager be a "special purpose computer."

21

UNITED STATES DISTRICT COURT
For the Northern District of California

1    Second, Tandberg's construction requires that the control manager manage "audio and video

2    switching circuitry"—a physical AV switch.  Third, Tandberg's construction requires that the

3    central control manager establish connections between physical ports on different workstations.

4         The phrase "central control manager" does not appear at any point in the specification.  The

5    parties agree, however, that the corresponding element of the preferred embodiment is the Audio

6    Video Network Manager, or AVNM.  See Spec. at 18:54–57 ("When the Collaboration Initiator is

7    started, it exchanges initial configuration information with the Audio Video Network Manager

8    (AVNM) 60 (shown in FIG. 3) through Data Network 902.").

9

10              1.    Special Purpose Computer

11        The basis of Tandberg's argument that the "central control manager" is a special purpose

12   computer is somewhat unclear.  Tandberg notes that the AVNM in the preferred embodiment

13   consists of software running on the MLAN server, and then cites WMS Gaming, Inc. v. International

14   Game Technology, 184 F.3d 1339, 1348 (Fed. Cir. 1999) for the proposition that "[a] general

15   purpose computer, or microprocessor, programmed to carry out an algorithm creates a new machine,

16   because a general purpose computer in effect becomes a special purpose computer once it is

17   programmed to perform particular functions pursuant to instructions from program software"

18   (internal quotations omitted).  In WMS Gaming, the Federal Circuit found that the district court had

19   improperly construed a means-plus-function claim element more broadly than the structure disclosed

20   in the specification.  Id.  In correcting the district court, the Federal Circuit limited the invention to

21   the disclosed embodiment—a computer programmed to run the claimed algorithm.  Id. at 1349 ("the

22   structure disclosed for the 'means for assigning' limitation of claim 1 of the Telnaes patent is a

23   microprocessor programmed to perform the algorithm illustrated in Figure 6.").

24        CPI does not dispute that, to the extent the central control manager includes software, the

25   software must run on a computer.  Indeed, CPI's proposed construction recites as much structure as

26   the construction adopted in WMS Gaming—computer hardware and software configured to perform

27

28
                                          22

1  the steps of establishing and managing connections for a video conference.  Labeling such hardware

2  and software a "special purpose computer" does not aid in understanding the claims.

3         2.     <u>Audio and Video Switching Circuitry</u>

4       As discussed <u>supra</u> in the context of "AV path," the claimed invention is not limited to

5  analog AV networks with physical AV switches.  Digital AV signals may be transmitted jointly with

6  the data over a packet-switched network, in which case there is no need for dedicated audio and

7  video switching circuitry.  Tandberg's proposed construction is therefore too narrow.

8

9         3.     <u>Connections Between Physical Ports</u>

10       For the same reason, the claim does not require that the central control manager establish

11  actual connections between physical ports on two or more workstations.  In the case of digital AV

12  signals transmitted over a packet-switched network, Tandberg does not argue that the physical

13  connection to the workstation will change during the course of initiating and connecting a

14  videoconference call.  The connection between the workstations is purely logical.  Also, as the

15  <u>Polycom</u> court noted, one of the disclosed embodiments allows for a wireless connection to a

16  workstation.  <u>See</u> Spec. at 38:49–67.  Tandberg's proposed construction is therefore too narrow.

17       CPI's construction is too broad in two senses, however.  First, the central control manager

18  must be able to manage connections for both video and data conferences.  '654 patent at 44:5–9

19  ("the data conferencing control establishing communication with the central control manager to set

20  up requested data paths along a second network over which the data conference can be conducted").

21       Second, the control manager must be "central."  Tandberg argues that the word "central"

22  requires that the central control manager reside computer which is physically separate from the

23  workstations.  CPI counters that the central control manager can be logically distinct and

24  "central"—brokering communications among multiple workstations—without residing on a

25  physically separate machine.  The court agrees that nothing in the claim language requires the

26  central control manager to be physically separate, but agrees with CPI's apparent concession that it

27  must be distinct in some way from the conferencing control, which is separately recited in the claim.

28

In addition, claim 15 requires that a single central control manager have the capability of

coordination communications among multiple workstations:  claim 15 recites a plurality of

workstations, each with a conferencing control, but only a single central control manager to set up

paths among them.  '654 patent at 43:20–28.

The court therefore construes the phrase "central control manager" to mean "hardware and /

or software that is distinct from the conferencing control and that is capable of establishing and

managing video and data connections for multiple workstations."

IV.   "group of collaboration types"

The phrase "group of collaboration types" appears in two dependent claims of the '547

patent.  Claim 19 is representative:

19. The system of claim 11, wherein the system is configured:

(a) to allow a first user
        (i) to use a first graphical user interface
        (ii) to select a user
        (iii) from a plurality of users; and

(b) to allow the first user
        (i) to use a second graphical user interface
        (ii) to select a collaboration type
        (iii) from a **group of collaboration types**; and

(c) to respond
        (i) by establishing communication
        (ii) of the selected collaboration type
        (iii) from the first user
        (iv) to the selected user.

'547 patent at 43:44–59.

CPI argues that the phrase "group of collaboration types" should be construed to mean "types

of collaboration, such as telephone, videophone, email, snapshot sharing, application sharing,

computer-integrated telephony, and computer-integrated fax."  Tandberg argues that the phrase

should be construed to mean "a group of methods by which information is synchronously and

asynchronously shared between workstations."  The parties' constructions differ in one respect:

Tandberg's construction requires that the group contain both synchronous and asynchronous

24

UNITED STATES DISTRICT COURT
For the Northern District of California

1  methods of sharing information.  Synchronous methods, such as videoconferencing and data

2  conferencing, involve the sharing of information in real time.  Asynchronous methods, such as

3  multimedia mail, involve the sharing of information that can be stored locally and retrieved at some

4  later time.

5        In support of its contention that the group must include both synchronous and asynchronous

6  collaboration types, Tandberg relies on the lists of possible collaboration types in the specification.

7  According to Tandberg, the fact that the lists always include both synchronous and asynchronous

8  collaboration types means that a CMW must be capable of both.  Although the specification

9  consistently uses the same list of possible collaboration types, and describes embodiments in which

10  the CMW supports both synchronous and asynchronous collaboration types, nowhere does the

11  specification support Tandberg's position that each CMW must support each collaboration type.

12        Other portions of the specification weigh against such a narrow reading.  Before a CMW is

13  permitted to place calls to other CMWs on the network, it must "register the collaborative services

14  [it] provide[s] with the Service Server."  Spec. at 20:66–21:1.  "Examples of these services indicate

15  [sic: include] 'video call', 'snapshot sharing', 'conference' and 'video file sharing.'"  Id. at 21:1–3.

16  A CMW need not include every possible collaborative service in its group of registered services.

17  For instance, the specification provides an example of a "portable laptop implementation" of the

18  CMW which is capable of participating in "voice and data communications," as well as "remote

19  control of mail or presentation playback," but not the videoconferencing features provided through

20  add-on videoconferencing hardware.  Id. at 18:16–31.  The specification expressly provides for the

21  flexibility to register a limited number of collaboration types, and includes at least one example of a

22  CMW that has less than the full complement of synchronous and asynchronous collaboration

23  capabilities.

24        The court therefore adopts CPI's construction.  The phrase "group of collaboration types"

25  means "a group of types of collaboration, such as telephone, videophone, email, snapshot sharing,

26  application sharing, computer-integrated telephony, and computer-integrated fax."

27

28

V.      "TV quality"

        The phrase "TV quality" appears in dependent claims of the '547 patent, and is used to indicate the quality of video images displayed by the claimed invention.  See, e.g., '547 patent at 45:48–49 ("reproducing the video images . . . at TV quality").  The parties disagree as to whether the Specification defines TV quality as a particular resolution in pixels, color depth, and number of frames per second, "30 frames per second at 640*480 pixels per frame and the equivalent of 24 bits of color per pixel with accompanying high-fidelity audio (typically between 7 and 15 KHz)," or whether the phrase should be read more broadly as "generally of the same quality as television (at the time the patent was filed)."

        The portion of the Specification cited by Tandberg states that

> [i]n the preferred embodiment, it has been found particularly advantageous to provide the above-described video at standard NTSC-quality TV performance (i.e., 30 frames per second at 640.times.480 pixels per frame and the equivalent of 24 bits of color per pixel) with accompanying high-fidelity audio (typically between 7 and 15 KHz).

Spec. at 6:48–53.  The problem with Tandberg's reliance on this passage, however, is that it expressly limits its applicability to the preferred embodiment.  It would be erroneous to limit the claim language as Tandberg suggests.

        Tandberg also offers excerpts from the file history to show that CPI disclaimed other levels of image and audio quality during prosecution.  The excerpts, however, are either taken from the prosecution of different claims from those at issue here or do not support Tandberg's proposed standard.  For example, Tandberg's excerpt from the prosecution of U.S. Patent No. 6,898,620 recites a standard of 25 Hz rather than 30 Hz, and mentions several alternate standards for TV quality—NTSC, PAL, and SECAM.  Tandberg does not argue that all of these standards conform to its proposed limitation.  Moreover, CPI points out that the "TV quality" limitation was added as part of a broadening amendment, replacing the language "greater than 20 frames per second."  It would be anomalous to construe the claim more narrowly than it was drafted prior to being broadened.

1    Finally, Tandberg once again argues that CPI's construction is too vague, and would result in

2    rejection under section 112.  Tandberg must raise its validity argument in a motion for summary

3    judgment or at trial.

4    The court therefore adopts CPI's construction.  "TV quality" is construed to mean "generally

5    of the same quality as television (at the time the patent was filed)."

6

7    VI.   <u>"a call state, being at least one of the group consisting of active and hold states"</u> / "a plurality

8    <u>of communication ports, each supporting at least one of the group of switch connections</u>

9    <u>consisting of video in, video out, audio in and audio out"</u>

10   The two disputed phrases from the '500 patent are interrelated, and must be construed

11   together.  Claim 1 of the '500 patent is representative of the use of both phrases.

12   1. A teleconferencing system comprising:

13   (a) a plurality of AV devices, each capable of
         (i) originating and reproducing
14             (1) user related audio and video signals;

15   **(b) a plurality of communications ports, each supporting**
         **(i) at least one of the group of switch connections consisting of**
16             **(1) video in, video out, audio in and audio out; and**

17   (c) at least one communication path,
         (i) arranged for transport
18             (1) of audio and video signals,

19   wherein the system is configured to
         (i) to control a communication connection
20             (1) between two of the AV devices,
                 (2) over the communication path,
21       (ii) by creating,
             (1) as a result of a call request,
22           (2) at least a first call handle,
                 i. associated with one of the two AV devices and,
23                  thereafter,
             (3) at least a second call handle,
24               i. associated with the other AV device,
             (4) each call handle defining,
25               i. for its respective AV device,
                 ii. **a call state, being at least one of the group**
26                  **consisting of active and hold states**; and

27

28

27

iii. the port switch connections involved in the communications connection.

'500 patent at 41:51–42:11 (emphasis added).

The claims of the '500 patent relate generally to the mechanics of placing and connecting a videoconference call between two AV devices (CMWs) using the invention described in the Specification. The description of the preferred embodiment illustrates the general process for how a videoconference call is connected.

First, before a CMW can participate in a videoconference call, it must connect to the AVNM and register the types of collaborative services it provides—such as videoconferencing or data sharing—in a central directory, or "service server." Spec. at 20:66–21:1. During registration, the CMW can specify "the audio/video ports physically connected to the particular CMW into which the user is logged in." Id. at 21:18–19. Based on the information provided by the CMW, the AVNM creates a data record called a "port abstraction, wherein each port represents an addressable bidirectional audio/video channel." Id. at 20:42–44.

In the preferred embodiment, a CMW has four physical connections to the AV switch: video in, video out, audio in, and audio out. Id. at 20:35–41. A CMW need not make all four of these connections available in its port abstraction, however. Instead,

> [c]lient programs can specify which of the 4 physical connections on its ports should be switched. This allows client programs to establish unidirectional calls (e.g., by specifying that only the port's input connections should be switched and not the port's output connections) and audio-only or video-only calls (by specifying audio connections only or video connections only).

Id. at 20:57–63. Moreover, not all devices participating in a conference must support all four connections:

> The system architecture also accommodates the situation in which the user's desktop computing and/or communications equipment provides varying levels of media-handling capability. For example, a collaboration session--whether real-time or asynchronous--may include participants whose equipment provides capabilities ranging from audio only (a telephone) or data only (a personal computer with a modem) to a full complement of real-time, high-fidelity audio and full-motion video, and high-speed data network facilities.

Id. at 3:38–46.

28

When a user initiates a videoconference from a CMW, the caller's CMW sends a call request to the AVNM, specifying the address of the callee's CMW. The AVNM then looks up the callee in the service database. Id. at 22:3–17. If the callee has registered a videoconference service, the AVNM proceeds to create two "call handle" records, and associates one call handle with each CMW's port abstraction. Id. at 22:54–61. The call handle records include information about the state of the call. Id. 23:11–20. If a CMW is connected to a call, the call handle will have an "active" state. Id. If a CMW places a call on hold, the associated call handle will be changed to a "hold" state. Id. A CMW has a separate call handle for each videoconference call it engages in, and can have multiple call handles at any one time. Id. at 23:7–10 ("Each port can have an arbitrary number of callhandles bound to it, but typically only one of these callhandles can be active at the same time."). For example, if a CMW is connected to one videoconference and has two more videoconferences on hold, the CMW will have a total of three call handles associated with its port abstraction.

Based on this overall understanding of how a call is placed in the preferred embodiment, the court now turns to the construction of the disputed terms.

A.    "a call state, being at least one of the group consisting of active and hold states"

CPI argues that the phrase "a call state, being at least one of the group consisting of active and hold states" should be construed to mean "the call state of the call handle must have at least one of two possible states; active (in a call) or on hold (connected but not transferring images or sound)." Tandberg argues that the phrase should be construed as follows:

> Call State:  the status of both audio and video connections indicating whether each connection is active or hold.
> Active State:  a call state in which information is exchanged over a dedicated physical connection between the caller and the callee.
> Hold State:  a call state permitting the caller to answer incoming calls or initiate new calls without releasing a previous call.

The parties' proposed constructions differ in two respects. First, the parties dispute whether a call state must have the ability to be simultaneously "active" and "hold," or whether the state may be

UNITED STATES DISTRICT COURT
For the Northern District of California

either "active" or "hold" individually.  Second, the parties dispute whether an "active" call is one

where information is exchanged over a dedicated physical connection.  The court has already

concluded, in the context of construing "AV path," supra, that calls need not be connected over a

dedicated physical connection.

Turning to whether the call state must be able to simultaneously be active and hold, the

phrase "configured to" in claim 1 indicates that the following elements are a recitation of the

claimed system's capabilities.[2]  Claim 1 thus requires that the system have the functionality of

creating a call handle which defines "a call state, being *at least* one of the group consisting of active

and hold states."  A system with the capability of creating a call handle with a call state of "active"

would fall within the literal scope of the claim, as would a system with the capability of creating a

call handle with a call state of simultaneously "active" and "hold."  The phrase "at least" is most

reasonably understood as broadening the claim to include systems with call states being

simultaneously "active" and "hold," as well as either individually, rather than requiring the call state

to be simultaneously "active" and "hold."  The court's construction is consistent with the

Specification, which clearly contemplates that the call state will toggle between "active" and "hold,"

but will not be both simultaneously.  See Spec. at 23:11–20.  The phrase "a call state, being at least

one of the group consisting of active and hold states" is therefore construed to mean "a call state,

which is 'active,' 'hold,' or both 'active' and 'hold' simultaneously."

B.      "a plurality of communication ports, each supporting at least one of the group of
         switch connections consisting of video in, video out, audio in and audio out"

The phrase "a plurality of communication ports, each supporting at least one of the group of

switch connections consisting of video in, video out, audio in and audio out" appears only in the

claims of the '500 patent, and is highlighted above.  CPI argues that the phrase should be construed

to mean "There are at least two communication ports in the video conferencing system (at least one

for each AV device), and that at least one port at each AV device supports at least one of audio in,

UNITED STATES DISTRICT COURT
For the Northern District of California

**UNITED STATES DISTRICT COURT**
For the Northern District of California

1   audio out and video in and video out."  Tandberg argues that the phrase should be construed as

2   follows:

> 3   A plurality of access points for entry or exit of audio and video signals to or from a
>     communication device, each access point connected to at least one of an audio in,
> 4   audio out, video in, and video out switch that may be individually opened or closed.
>     Switch Connections:  audio in, audio out, video in, and video out circuits that may be
> 5   individually opened or closed.
>     Communications Port:  A set of access points for entry or exit of audio and video
> 6   signals to or from a communication device.

7   The parties' constructions differ in two respects.  First, Tandberg argues that the phrase requires that

8   each communication port must be capable of all four modes of communication—audio in, audio out,

9   video in, and video out.  Second, Tandberg argues that each of the four modes of communication

10  must be capable of being individually switched.

11

12                      1.      Modes of Communication

13          The claim language precludes Tandberg's proposed construction, as the claims only require

14  that each port support "at least one of the group of connections consisting of . . . video in, video out,

15  audio in and audio out."  '500 patent at 41:56–58.  This language is identical in structure to the

16  phrase "a call state, being *at least* one of the group consisting of active and hold states," which the

17  court has just construed.  A port supporting "video in" alone thus falls under the scope of the claim,

18  as does a port simultaneously supporting "video in" and "video out."

19          This construction is completely consistent with the use of the word "port" in the

20  Specification.  The Specification uses the word "port" in two different senses.  The first sense is a

21  physical connection to a device, such as a CMW.  See Spec. at 15:61–64 ("camera 500 and

22  microphone 600 capture and transmit outgoing video and audio signals into ports 801 and 802,

23  respectively, of Add-on box 800."); id. at 15:64–65 ("Incoming video and audio signals (from

24  another videoconference participant) are received across AV network 901 through Audio/Video I/O

25  port 805.").  Physical ports may support only a single type and direction of data, see port 801 of

26  Figure 18A, or they may combine multiple types and directions of data, see port 805 of Figure 18B.

27

28

                                                31

UNITED STATES DISTRICT COURT
For the Northern District of California

The second sense is a logical "port"—a data structure used by the AVNM to initiate and manage connections between devices.  See id. at 20:41–44 ("For each device on the network, the AVNM combines these four connections into a port abstraction, wherein each port represents an addressable bidirectional audio/video channel.").  There is not a one-to-one correspondence between inputs and outputs in a port abstraction and physical inputs and outputs in the system.  Id. at 20:45–48 ("Different ports may share the same physical connections on the switch. For example, a conference bridge may typically have four ports (for 2.times.2 mosaicing) that share the same video-out connection.").  Also, each port abstraction in the preferred embodiment is not required to have all four connection types:  "Not all devices need both video and audio connections at a port. For example, a TV tuner port needs only incoming audio/video connections."  Id. at 20:48–51. Finally, as discussed above, workstations participating in a videoconference need not support all four connection types.  Id. at 3:38–46.

CPI's construction is flawed, however, in that it requires that only "at least one port at each AV device supports at least one of audio in, audio out and video in and video out."  The claims require that "each" port support at least one of audio in, audio out and video in and video out.

## 2.   Individually Switched

The claim language does not require that each connection be individually switched.  The claim language is "switch connection," not "switched connection."  A "switch connection" is a connection to a switch, either digital or analog.  See Spec. at 7:13–18 ("Further, as the current preferred embodiment uses analog networking for audio and video, it also physically separates the real-time and asynchronous switching vehicles and, in particular, assumes an analog audio/video switch.  In the future, a common switching vehicle (e.g., ATM) could be used."); id. at 8:49–50 ("A/V Switching Circuitry 30 (whether digital or analog as in the preferred embodiment) provides common audio/video switching for CMWs").

The court therefore accepts CPI's construction, with the modification set forth above, and construes the phrase "a plurality of communication ports, each supporting at least one of the group

32

of switch connections consisting of video in, video out, audio in and audio out" to mean "at least two communication ports in the video conferencing system (at least one for each AV device), each port supporting at least one of audio in, audio out and video in and video out connections to an analog or digital AV switch."

CONCLUSION

     For the foregoing reasons, the court construes the disputed terms as set forth above.

     IT IS SO ORDERED.

Dated: June 22, 2006

                                        MARILYN HALL PATEL
                                        District Judge
                                        United States District Court
                                        Northern District of California

1

UNITED STATES DISTRICT COURT
For the Northern District of California

<u>**ENDNOTES**</u>

1.  Unless otherwise noted, background facts are taken from the patents at issue and from the declarations accompanying the parties' claim construction briefs.

2.  The court takes up the meaning of "configured to" in more detail in its order denying Tandberg's motion for summary judgment of invalidity under 35 U.S.C. section 112.

2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28