UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| COLLABORATION PROPERTIES, INC., a Nevada Corporation<br><br>        Plaintiff/Counter-Defendant,<br><br>  v.<br><br>TANDBERG ASA and TANDBERG, INC., a Delaware Corporation<br><br>        Defendants/Counter-Plaintiffs.<br>                                               / | No. C 05-01940 MHP<br><br>**MEMORANDUM & ORDER**<br>**Re: Plaintiff's Motion for Costs** |

On May 11, 2005, plaintiff Collaboration Properties, Inc., a Nevada Corporation ("CPI") filed a complaint alleging patent infringement (the "Complaint") against defendants, Tandberg ASA and Tandberg Inc., a Delaware Corporation ("Tandberg"). On July 15, 2005 defendants filed an answer and counterclaim against plaintiff and counter-defendant CPI, denying infringement and further alleging that the patents in question are not duly and lawfully issued to the plaintiff. Now before the court is plaintiff's motion for costs and to strike certain of defendants' invalidity contentions. Having considered the parties' arguments and submissions, and for the reasons set forth below, the court enters the following memorandum and order.

BACKGROUND[1]

The present motion stems from CPI's request to inspect two alleged "prior art" systems identified in Tandberg's Preliminary Amended Invalidity Contentions—the "Vision" (also known as the "Vision Classic") and the "TT4001." The invalidity contentions identify the two systems as

prior art, as well as the "supporting technical manuals, product brochures and other documentation." Declaration of Noah M. Leibowitz in Support of CPI's Memorandum for Costs and Expenses ("Leibowitz Dec."), Exh. A at 5, 8. On October 12, 2005, CPI served a request for documents that included the request to inspect the two systems:

> Each product . . . that YOU allege is prior art under 35 U.S.C. § 102 set up in a videoconference between at least two endpoints and/or in any manner contended by YOU to invalidate in whole or in part any claim of the PATENTS-IN-SUIT. If the alleged items of prior act are inoperable, or it is impossible to configure a videoconference using the alleged prior act, then the alleged prior art should still be produced for inspection.

Declaration of Chester W. Day in Support of Tandberg's Memorandum in Opposition to CPI's Motion for Costs ("Day Dec."), Exh. A at 5 ¶ 12. Tandberg agreed to allow CPI to inspect the two devices in Norway, but CPI requested that the devices be transported to the United States. In opposition, Tandberg submitted a declaration from Mr. Tom-Ivar Johansen, a Tandberg employee in Norway, explaining that the devices were old and fragile:

> Because of their age and fragile conditions, the TT4001 and Vision Classic devices are irreplaceable. Tandberg does not routinely repair such devices and does not stock parts for these devices.

Day Dec., Exh. B at 2 ¶ 6. At a March 20, 2006 hearing, the court ordered CPI to travel to Norway to conduct an inspection of the two systems. However, the court noted to CPI that "if your people go over there and it turns out it's been a total waste of time because they have misrepresented something about these pieces of equipment, this TT 4001, or whatever, and the Vision [Classic] . . . I can order them to pay the cost of your trip." Leibowitz Dec., Exh. B at 22.

CPI made arrangements to travel in Norway in early April, 2006. In a letter dated April 3, 2006, Tandberg purports to summarize a "meet and confer" between the parties that took place on March 30, 2006, which included a discussion of CPI's upcoming trip to Norway. See Leibowitz Dec., Exh. F, Part 2, Encl. 3. Tandberg alleges that during this meeting it communicated to CPI that the "TT4001s codes are currently not operable and cannot be rendered so given the short notice of CPI's inspection demand (if at all)." Id. at 4. In the letter Tandberg describes a CPI request to inspect Synercom software in conjunction with the Vision Classic devices during the planned

2

inspection in Norway. Id. However, Tandberg claims that this request was received on March 31, 2006 at 11.25 a.m. (PST), after the close of business in Norway, and in the April 3 letter, Tandberg informed CPI that it attempted to locate such software and found that it currently had none in its possession. Id.

On April 3 and 4, 2006, Noah M. Leibowitz, an attorney with plaintiff's counsel, Simpson Thacher & Bartlett LLP, along with Mr. Christopher Schmandt, Principal Research Scientist at the Massachusetts Institute of Technology ("MIT") Media Lab and a CPI expert consultant, traveled to Tandberg's facility in Lysaker, Norway to inspect the Vision and TT4001 systems. Upon arrival at Tandberg's facility in Norway, Tandberg provided CPI with access to the two Vision Classic systems and two TT4001s. Tandberg also arranged for a Tandberg engineer to be available to answer any questions and provide any assistance to CPI, as needed.

CPI found the two Vision systems were connected to modern IBM laptop computers running Windows XP and other current-day software. While inspecting the Vision systems, CPI was able to access a menu that displayed the version of Tandberg's Vision software that the Vision systems were running. See Leibowitz Dec., Exh. C. The Vision Classic systems made available to CPI in Norway were running version K2.2 of Tandberg's Vision software, which was released in July 1995 and therefore post-dates the critical patents-in-suit by three years. Moreover, the two TT4001s stored at Tandberg's Norway facility were not powered-up, nor connected to any network or external device such as a monitor, keyboard, speaker, or camera. Tandberg denied CPI's request to power up the TT4001 because the devices had been dormant for years and Tandberg's engineer on site was concerned about the potential adverse consequences of attempting to power up the devices. As a result Mr. Leibowitz and Mr. Schmandt were only able to examine the outside of the TT4001 boxes.

Upon return to the United States, on June 1, 2006, CPI sent a letter to Rory G. Bens, counsel for Tandberg, requesting reimbursement for CPI's costs and expenses incurred with respect to the Norway trip, totaling $55,611.50. CPI's costs and expenses related to the Norway trip include

3

attorney and expert preparation for the trip, travel to and from Norway and conducting and documenting the inspection as follows:

| | | |
|---|---|---|
| Noah M. Leibowitz time: | 43.9 hours @ $550/hour= | $24,145.00 |
| Jonathan Sanders time: | 2.5 hours @ $450/hour= | $1,125.00 |
| Christopher Schmandt invoice: | | $13,637.00 |
| Surridge Films invoice: | | $3,670.00 |
| Noah M. Leibowitz airfare (New York/Oslo): | | $5,151.70 |
| Noah M. Leibowitz hotel and meals: | | $313.43 |
| Christopher Schmandt airfare (Boston/Oslo): | | $6,679.20 |
| Christopher Schmandt hotel and meals: | | $542.39 |
| Taxi in Norway | | $30.57 |
| Taxi from airport in New York | | $172.69 |

See Leibowitz Dec., Exh. G.

CPI claims that it is entitled to compensation for two reasons. First, CPI argues that the purpose of its trip was thwarted because its expert was unable to conduct an examination of the two TT4001 systems, which had not been powered up in 13 years. Second, the two Vision systems, in the manner in which they were configured for CPI inspection—running software dating from 1995—did not predate the critical dates of the patents-in-suit and therefore according to CPI do not qualify as "prior art." Furthermore, CPI moves to strike certain of Tandberg's invalidity contentions as they relate to allegedly "prior art" systems on the basis that Tandberg now claims that it is not relying on these physical systems at all.

LEGAL STANDARD

Three primary sources of authorities enable courts to sanction parties or their lawyers for improper conduct: (1) Federal Rule of Civil Procedure 11, which applies to signed writings filed with the court, (2) 28 U.S.C. section 1927, which is aimed at curtailing conduct on the part of an

4

attorney that unreasonably and vexatiously multiplies the proceedings, and (3) the court's inherent power.  See Fink v. Gomez, 239 F.3d 989, 991 (9th Cir. 2001).

DISCUSSION

I.     Authority to Order Sanctions

In its brief, CPI relies on 28 U.S.C. section 1927 as an authority for the court to award damages.  Under 28 U.S.C. section 1927, "[a]ny attorney . . . who multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonable incurred because of such conduct."  28 U.S.C. § 1927.  An award of sanctions under section 1927 "must be supported by a finding of subjective bad faith."  B.K.B. v. Maui Police Dep't, 276 F.3d 1091, 1107 (9th. Cir. 2002) (quoting In re Keegan Mgmt. Co. Sec. Litig., 78 F.3d 431, 436 (9th Cir. 1996)).  The Ninth Circuit has held that bad faith "is present when an attorney knowingly or recklessly raises a frivolous argument, or argues a meritorious claim for the purpose of harassing an opponent."  Id. (quoting Keegan, 78 F.3d at 436) (original emphasis omitted).  Thus, "reckless nonfrivolous filings, without more, may not be sanctioned [under section 1927]."  Keegan, 78 F.3d at 436.

The current case is more appropriately adjudicated under the court's inherent power owing to the involvement of Tandberg's employees, as well as its attorneys, in the conduct at issue.  The Supreme Court has long acknowledged that federal courts have the inherent power to manage their own proceedings and to control the conduct of those who appear before them.  See Chambers v. NASCO, Inc., 501 U.S. 32, 44 (1991) (holding that "these powers are 'governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases.'") (quoting Link v. Wabash R. Co., 370 U.S. 626, 630–31 (1962)); see also Roadway Express, Inc. v. Piper, 447 U.S. 752, 766 (1980) (explaining that federal courts possess the inherent power to levy sanctions, including attorneys' fees, for "willful disobedience of a court order . . . or when the losing party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons . . . .") (internal quotation marks and citations omitted).

5

1       To insure that restraint is properly exercised, in order to impose sanctions under its inherent
2  powers, district courts are required to ascertain a finding of bad faith. See Zambrano v. City of
3  Tustin, 885 F.2d 1473, 1478 (9th Cir.1989); accord Yagman v. Republic Ins., 987 F.2d 622, 628 (9th
4  Cir.1993) ("Courts may not invoke these powers without a 'specific finding of bad faith.'") (internal
5  citations omitted). The court's inherent powers "derive from the absolute need of a trial judge to
6  maintain order and preserve the dignity of the court." Id.

## II.   TT4001 Systems

Tandberg offers several reasons why it should not be sanctioned for asserting that the TT4001 is prior art and for failing to inform CPI that CPI would not be permitted to attempt to operate the TT4001s in Norway. First, Tandberg argues that it has never alleged that the two TT4001s located in Norway are in and of themselves "prior art." Rather Tandberg asserts that in its Amended Preliminary Invalidity Contentions, it was solely relying on the "technical manuals, and other printed publications prior to October 1992 " describing its TT4001 devices. Leibowitz Dec., Exh. A. This argument is impossible to square with the invalidity contentions, which also state that to the extent that these devices were "publicly known and used in the U.S. on or before October, 31, 1992," they also constitute prior art. Id. at 5.

Tandberg's argument that the two devices in Norway were not themselves sold in the United States is irrelevant. Tandberg argued to this court that the two remaining TT4001s located in Norway may help to corroborate the manuals and moreover, the devices in Norway are representative of the devices sold in the United States. See Leibowitz Dec., Exh. F, Part 2 ("Tandberg believes that these devices are representative of the prior art devices offered for sale and sold within the United States."). At the March 20, 2006 hearing, Tandberg's counsel represented to the court that "the equipment is of interest because it will help explain what the manuals say." Leibowitz Dec., Exh. B at 14.

Second, Tandberg maintains that during the March 30, 2006 "meet and confer" between the parties that it informed CPI prior to its trip to Norway that the TT4001s would not be operational in

6

time for CPI's planned inspection of the devices. See Leibowitz Dec., Exh. F, Doc. 2, Encl. 2. However, Tandberg's only evidence of this discussion is catalogued in a brief hearsay statement in a letter dated April 3, 2006, when CPI was already en route to Norway for its planned inspection of Tandberg's facilities. Furthermore, Tandberg's previous statements to CPI concerning the condition of the TT4001s in Norway were more encouraging. See Leibowitz Dec., Exh. B at 11 (during the March 20, 2006 court hearing, although Tandberg informed CPI that the TT4001 devices had not been powered up for a long time and were likely not operational, Tandberg expressly noted that "if [CPI] would like to see these devices in operation . . . we will endeavor to repair the TT4001 so that it's operable and they can inspect it, but that they should do this inspection at Tandberg's facility in Norway."). As a result, although CPI might have been aware that the TT4001s had not been powered up in many years, there was no indication that CPI would be prevented from even attempting to power up the devices during its inspection in Norway.

Lastly, Tandberg contends that it reserved a private space at its facilities in Norway over a two-day period and arranged for Mr. Johansen, a Tandberg engineer, to be on hand to assist CPI in its inspection. See Day Dec., Exh. D. Tandberg argues that CPI and its expert spent a mere three hours inspecting the systems and raised no complaints about the inspection until after returning to the United States. However, CPI was informed that the TT4001s would not be powered up, foreclosing the possibility of a more detailed inspection. Moreover, Tandberg admits that the TT4001s could not have been repaired within two days, effectively conceding that further attempts to inspect the TT4001s during the trip would have been fruitless.

III. <u>Vision Classic Systems</u>

Similar to its argument with respect to the TT4001 devices, Tandberg maintains that the Vision Classic systems located in Norway do not in and of themselves constitute prior art. However, as discussed above this argument is incompatible with Tandberg's previous representations.

Tandberg also argues that it only learned that CPI wished to inspect a system configured with the prior art "Synercom" software on March 31, 2006, four days before the visit. See Leibowitz

7

Dec., Exh. F, Doc. 2, Encl. 2. Tandberg claims that despite receiving the request after the close of business in Norway on a Friday, it made an attempt to locate the software, but found that it had none in its possession.

Tandberg has no reasonable basis for its claim of surprise as to CPI's desire to inspect systems configured as they would have been during the relevant period. In its Amended Preliminary Invalidity Contentions, Tandberg expressly lists "Tandberg Vision and TT4001 products, available in the U.S. at least by October 31, 1992, and supporting technical manuals, product brochures and other documentation." Leibowitz Dec., Exh. A at 8. By representing that the systems in Norway were representative of the asserted prior art, Tandberg necessarily represented that they were configured similarly to the alleged prior art, i.e. as they would have been prior to the critical date. See Leibowitz Dec., Exh. F, Part 2 ("Tandberg believes that these devices are representative of the prior art devices offered for sale and sold within the United States."). Tandberg's argument that the 1995 software, which the Vision Classic devices were operating at the time of the inspection, is virtually identical to the pre-critical date software is specious, as it would require CPI to accept Tandberg's contentions without independent scrutiny, a prospect that the evidence shows would be foolhardy on CPI'spart.

Tandberg also argues that CPI could have tested the hardware alone for two of the three asserted patents. See Leibowitz Dec., Exh. F, Part 2 ("First, the software is only relevant to claims of the '500 patent. Thus, according to this argument, CPI could and did complete its inspection with respect to the '654 and '547 patents."). The claims of both United States Patent Nos. 5,867,654 and 6,212,547 (the "'654" and "'547" patents respectively) require interactive data sharing. Verifying the data sharing capability requires a functioning combination of hardware and software. As a result, the particular software running on the Vision Classic devices was critical to CPI's inspection in Norway.

/////
/////
/////

8

IV. <u>Bad Faith</u>

Because the court is examining plaintiff's motion for sanctions pursuant to the inherent power of the court to prevent abuse of the judicial process, the court must address the threshold issue of whether Tandberg acted in bad faith. <u>See</u> <u>Zambrano</u>, 885 F.2d at 1478. Viewed together, Tandberg's arguments prior to the trip with respect to the systems in Norway being representative of prior art are at best grossly incompetent. They are particularly troubling in light of Tandberg's previous insistence that CPI must travel to Norway to avoid damaging the TT4001 systems—which turned out to be inoperable— and to have access to Tandberg's special testing facilities. <u>See</u> Leibowitz Dec., Exh. A at 16 ("these devices are already hooked up. They can be shown to them when they come to Norway for the deposition or before that if they want to inspect them sooner.").[2]

Tandberg's actions demonstrate an "improper purpose" and the court is within its authority to award costs for bad faith. <u>See</u> <u>United States v. Stoneberger</u>, 805 F.2d 1391, 1393 (9th Cir. 1986) (holding that "[a] specific finding of bad faith . . . must 'precede any sanction under the court's inherent powers.'" (quoting <u>Roadway</u>, 447 U.S. at 767). "Willful or reckless disregard of court rules justifies punitive action." <u>Zambrano</u>, 885 F.2d at 1484.

In a vacuum, Tandberg might receive the benefit of the doubt. Here, Tandberg's history of careless behavior weighs against it. <u>See</u> Memorandum and Order re: Motion for Leave to Seek Reconsideration, Docket No. 184 at 4 ("Here, the court has found undue delay, prejudice and frustration of the efficient administration of justice . . . . The court's concerns about gamesmanship have not diminished, particularly in light of Tandberg's ongoing aggressive and arguably frivolous motion practice."). In view of all circumstances, Tandberg's behavior prior to the Norway trip is in bad faith.

Tandberg does not dispute the specific amount of fees, but rather that the trip to Norway was unnecessary. However, Tandberg's decision to withhold facts about the systems can only be characterized as a bad faith attempt to impose additional burdens on CPI, and Tandberg should reimburse CPI in the amount of $55,466.98 for costs and expenses associated with the Norway trip.

9

V.   Motion to Strike Tandberg's Invalidity Contentions

CPI also moves the court to strike the portions of Tandberg's invalidity contentions that depend on the TT4001 and Vision Classic devices, as opposed to the manuals or other printed documentation. See Leibowitz Dec. Exh. F at 2 ("Tandberg does not assert that the devices in Norway, in and of themselves, constitute invalidating prior art."). Tandberg's Amended Preliminary Invalidity Contentions fail to clearly differentiate between Tandberg's reliance on the printed manuals describing the Vision Classic and TT4001 devices and the actual physical devices themselves. See Leibowitz Dec., Exh. A at 8 ("Tandberg Vision and TT4001 products, available in the U.S., *and* supporting technical manuals, product brochures and other documentation.") (emphasis added). Given that Tandberg now argues that it is relying on manuals rather than the systems and given Tandberg's failure to identify any example of an operative system that pre-dates the patents-in-suit, CPI's motion to strike is granted.

VI.   Summary

In summary, this court finds that Tandberg shall reimburse CPI for its costs and expenses incurred for the Norway trip in April 2006. Although Tandberg claims that its invalidity contentions do not rely on the Vision Classic and TT4001 systems located in Norway, Tandberg did claim that the devices in Norway are representative of the devices sold in the United States. The costs associated with CPI's trip to Norway could have been avoided altogether if Tandberg had disclosed that CPI would be unable to test Tandberg's invalidity contentions because the Vision Classic was running software that post-dates the critical date of the patents-in-suit by three years and the TT4001s were not even powered up. Furthermore, for the reasons stated above CPI's motion to strike is granted.

/////
/////
/////
/////

10

CONCLUSION

For the foregoing reasons, the court hereby GRANTS plaintiff's motion for fees and costs in the amount of $55,466.98 and GRANTS plaintiff's motion to strike the Vision Classic and TT4001 systems from defendant's invalidity contentions.

Defendant and its counsel shall pay over to plaintiff the amount of $55,466.98 within thirty (30) days of the date of this order.

IT IS SO ORDERED.

Dated: September 5, 2006

MARILYN HALL PATEL
District Judge
United States District Court
Northern District of California

11

**ENDNOTES**

1. Unless other specified, background facts are taken from plaintiff's Complaint and defendant's Answer and Counterclaim, and are assumed to be true for the purposes of this motion only.

2. Tandberg even goes so far as to argue that CPI should not be entitled to any reimbursement because a separate trip to Norway to inspect the devices was unnecessary and could have been combined with a trip to complete the depositions of Tandberg's Norway employees. Tandberg does not offer a coherent explanation, however, as to how combing the trips would have saved any costs. The inspection is separate from any depositions, and would have required additional attorney and expert time. The court agreed that CPI should fly to Norway for the inspection rather than force Tandberg to ship the devices to the United States. See Leibowitz Dec., Exh. B at 23. Tandberg cannot now complain about the costs and timing of a trip that it insisted on.